## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| DAVID M. MORRIS, *Individually and On Behalf of All Others Similarly Situated*,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>THE CHARLES SCHWAB CORPORATIONS and CHARLES SCHWAB & CO., INC.<br><br>　　　　　Defendants. | Case No. |

## CLASS ACTION COMPLAINT

Plaintiff David M. Morriss ("Plaintiff"), on behalf of himself and all others similarly situated, brings this action as a class action against defendants The Charles Schwab Corporation ("Charles Schwab") and Charles Schwab & Co., Inc. ("CS&Co") (collectively "Defendants").

## INTRODUCTION

1.　　　A cash sweep account is a type of bank or brokerage account that is linked to an investment account and automatically transfers funds when the balance is above or below a preset minimum. Typically, this is used to sweep excess cash into a money market fund, where it will earn more interest than an ordinary bank account. This case arises from Defendants' exploitative and unfair implementation

of their Bank Sweep Program (the "Program"), resulting in the breach of Defendants' fiduciary duties owed to Plaintiff and similarly situated retirement account investors as their investment advisors and their contractual obligation pay a "reasonable rate" of interest for "retirement and other benefit plan accounts … consistent with applicable legal and regulatory requirements."

2.     Specifically, when acting as their customers' agents and fiduciaries, defendant CS&Co "sweeps" uninvested cash balances in its customers' accounts and deposits that cash into accounts located at its Affiliated Banks—wholly owned subsidiaries of Charles Schwab (including Charles Schwab Bank, SSB; Charles Schwab Premier Bank, SSB; and Charles Schwab Trust Bank), as well as TB Bank, N.A. and T.D. Bank USA, NA (which Charles Schwab acquired in 2020 in connection with its acquisition of TD Ameritrade Holding Corporation). Because the Affiliated Banks' accounts pay far below market rates of interest, Plaintiff and other Class members have lost significant amounts of interest they would have otherwise earned had CS&Co swept their uninvested cash into bank accounts that pay a reasonable market interest rate.

3.     In its agreement with its customers, CS&Co specifically acknowledges that it acts as its customers' "agent" and fiduciary in establishing, maintaining, and operating the Program. Under the broad scope of the agency, CS&Co selects the banks to participate in the Program, the type of accounts to which the Program

2

applies, the type of bank accounts in which the CS&Co's customers' funds are swept, the negotiation and agreement as to the interest rates to be paid to CS&Co customers under the Program, and the negotiation and agreement as to any compensation or the foregoing of such compensation by CS&Co for the benefit of either its customers or another entity, including the Affiliated Banks.

4.     From 2018 through March 2019, and again from March 2022 onwards, when the Federal Reserve began raising the target federal funds rate, the reasonable value of swept cash consistently exceeded the amounts paid by Defendants on sweep accounts. Comparable brokerages such as Fidelity Investments, R.W. Baird, Robinhood, and Vanguard Investments, which did not sweep cash to affiliated banks, but rather swept cash to independent, unaffiliated banks, paid substantially higher rates on swept cash, than Defendants paid. For example, Fidelity paid retirement investors as much as 2.72% APY on swept cash regardless of AUM, starting in August 2023, and R.W. Baird paid retirement investors between 2.07% to 4.15% on swept cash, depending on cash balances, as of September 8, 2023.

5.     Other metrics, including the federal funds rate, and rates paid by online banks, and government money market funds, further evidence that the paltry rates paid by Defendants on retirement sweep accounts were not reasonable.

6.     CS&Co breached its fiduciary duties when it placed its customers' cash in low interest-bearing accounts held by its own Affiliated Banks and then pocketed

the unpaid interest as additional profit.

7.     CS&Co failed to adequately disclose to its customers that, as to the Program, it was essentially providing a kickback to its own affiliates at its customers' expense. Specifically, Defendants shortchanged their customers for their and their affiliates' benefit by negotiating with the Affiliated Banks one-sided transactions that swept cash into exceedingly low-interest accounts. CS&Co failed to disclose and discuss these conflicted transactions, much less obtain informed consent from its customers and principals.

8.     Plaintiff brings this action individually and on behalf of a Class of similarly situated individuals for breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment and violation of California's Unfair Competition Law ("UCL"), to recover damages arising out of Defendants' violations of the law, and for such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. §1332(d)(2), as this action is brought as a class action on behalf of class members, one or more members of the class are citizens of a state different than the Defendants, and the amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

10. The Court has personal jurisdiction over Defendants because Charles Schwab regularly transacts business in Florida through its wholly owned subsidiaries, including defendant CS&Co, and thus has minimum contacts in Florida and in this District.

11. Venue is proper under 28 U.S.C. § 1391 because among other things a substantial part of the events, omissions, and/or relevant conduct by Defendants giving rise to Plaintiff's claims occurred in this District (where Plaintiff resides and conducted business with Defendants).

## PARTIES

### A. Plaintiff

12. Plaintiff is a customer of CS&Co and is a resident and citizen of Port Charlotte, Florida. Plaintiff maintained a Roth Contributory IRA in a brokerage account with Defendants in which cash was held over the course of the life of the account. While Plaintiff was a Charles Schwab customer, the cash held in his account was automatically "swept" into a low interest-bearing bank account at Affiliated Banks pursuant to the Program.

### B. Defendants

13. Defendant Charles Schwab is a financial services firm based in the U.S. with operations worldwide, including in Florida. Charles Schwab is a holding company that conducts business through its subsidiaries including Defendant CS&Co, and non-party Charles Schwab Bank. Charles Schwab is a Delaware corporation with

its headquarters at 3000 Schwab Way, Westlake, TX 76262.

14.     Defendant CS&Co is a California corporation with a registered corporate agent in this District at 330 N. Brand Boulevard, Glendale, CA. CS&Co is a full-service broker-dealer and investment advisor registered with the SEC. CS&Co is a wholly-owned subsidiary of defendant Charles Schwab.

## FACTUAL BACKGROUND

### A. Defendants' Customer Relationship

15.     The relationship between CS&Co and its customers, including Plaintiff, is set forth in written agreement, including the Schwab One Brokerage Account agreement (the "Account Agreement"). Because Plaintiff maintained an IRA within his brokerage account, his relationship with Defendants is further governed by the Schwab IRA Account Agreement ("IRA Agreement."). Both the Account Agreement and the IRA Agreement provide that the Program is governed by the terms and conditions set forth in Cash Features Program Disclosure Statement ("Program Disclosures").

16.     Through their assent to the Account Agreement and IRA Agreement, customers like Plaintiff consent to their participation in the Program.

17.     The Account Agreement states that CS&Co acts as customers' "agent" in opening deposit accounts at Program Banks and automatically sweeping money into those accounts.

18.     By entering a custodial and agency relationship with Plaintiff and members of the putative Class, Defendants assumed fiduciary duties including the duty of loyalty, the duty of care, the duty to act in good faith, the duty of full and fair disclosures, and the duty to make prudent investment recommendations. These fiduciary duties are meant to always ensure Defendants act with integrity and in the best interests of the client.

19.     Defendant's fiduciary duties to as broker-dealers are described in Regulation Best Interest (Reg BI) under the Securities Exchange Act of 1934, which requires them to act in the best interests of the retail customer at the time a recommendation is made. Reg BI obligations broker-dealers, when making an investment recommendation, to meet four core obligations: *Disclosure* (providing certain prescribed disclosure before or at the time of recommendation, about the recommendation and the relationship between the retail customer and the broker-dealer); *Care* (exercising reasonable diligence, care, and skill in making the recommendation); *Conflicts of Interest* (establishing, maintaining, and enforcing policies and procedures reasonably designed to address conflicts of interest); and *Compliance* (establishing, maintaining, and enforcing policies and procedures reasonably designed to achieve compliance with Reg BI).

20.     Defendants' fiduciary duties are also reflected in its Code of Conduct. *See* https://content.schwab.com/web/retail/public/about-

schwab/schw_code_of_conduct_jan2022.pdf.

**B. The Bank Sweep Program**

21.     A "sweep program" is a "service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product as described in § 270.2a-7 or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation." See 17 CFR 240.15c3-3(a)(17).

22.     Sweep deposits play a pivotal role as a capital source for banks, empowering them to utilize these deposits for various corporate purposes. This includes activities such as making loans or investing in government securities. The disparity between the interest rate paid and the interest rate earned by a bank on those deposits is commonly referred to as the net interest margin ("NIM").

23.     The SEC, in its Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest, issued August 3, 2022, emphasized that "cash sweep programs" are a "common source[ ] of conflicts of interest." See https://www.sec.gov/tm/iabd-staff-bulletin-conflicts-interest.

24.     According to the Program Disclosures, Affiliated Banks are the exclusive option for the Program. CS&Co directed all accounts participating in the Program, including Plaintiff's, to its Affiliated Banks.

25.     The Program Disclosures provides that "[i]nterest rates on the Deposit

Accounts may be established at a rate as low as possible consistent with prevailing market and business conditions. Interest will be credited by TD Bank and TD Bank, USA as calculated by Schwab. ***Retirement and other benefit plan accounts will be paid a reasonable rate consistent with applicable legal and regulatory requirements***." (Emphasis added).

26.    CS&Co acted as its customers' agent and exercised discretion with respect to the Program. For example, Defendants' IRA Agreement states: "Schwab can (i) make changes to the terms and conditions of our Cash Features Program; (ii) make changes to the terms and conditions of any Cash Feature; (iii) change, add, or discontinue any Cash Feature; (iv) change your investment from one Cash Feature to another if you become ineligible for your current Cash Feature, your Cash Feature is discontinued, or such change is required pursuant to any regulatory requirement; and (v) make any other changes to the Cash Features Program or Cash Features as allowed by law."

27.    CS&Co exercised its discretion concerning the Program in bad faith to the detriment of its customers.

28.    The Program primarily benefited CS&Co and its affiliates at the expense of its customers.

29.    CS&Co enters transactions by which it establishes and pays unreasonably low interest rates to its customers in the Program. In contrast to the

unreasonably low returns CS&Co pays its customers, CS&Co shifts to its Affiliated Banks a substantial portion of the beneficial returns on its customers' cash that would otherwise constitute its customary compensation in connection with the Program.

30.    The Program Disclosures acknowledge that "Affiliated Program banks intend to use the cash to fund current and new investments. In addition, Schwab Bank and Schwab Premier Bank intend to use the cash balances in the Deposit Accounts to fund current and new lending activities. The profitability on such activities is generally measured by the difference, or 'spread,' between the interest rate paid on the Deposit Accounts and other costs of maintaining the Deposit Accounts, and the interest rate and other income earned by an Affiliated Program Bank on the loans and investments made with the funds in the Deposit Accounts." Thus, Defendants admit that by keeping the interest rates in Plaintiff and Class members' Deposit Accounts lower, it earns a higher profit.

31.    Through their operation of the Program, Defendants engage in self-dealing, creating a profit center that benefits only them, to the financial detriment of their customers.

### C. Defendants' Disclosures to Its Customers Regarding the Bank Deposit Sweep Program Contained Material Misrepresentations and Omissions

32.    Defendants' disclosures contain material misrepresentations and omissions regarding the Program.

33.      The Program Disclosures state, "The interest rates paid on the Deposit Accounts can be higher *or lower* than the interest rates available for other Cash Features or to depositors making deposits directly with a Program Bank or other depository institutions in comparable accounts." (Emphasis added). This statement is false and misleading because, as Defendants knew at the time its customers entered the Program, the interest rate on the cash sweep deposit account will be lower than yields on essentially any other available cash alternatives.

34.      The Program Disclosures also state that "[i]nterest rates are set at the Affiliated Banks' discretion". This statement is misleading because it omits Defendants' role in the process and Defendants' ability to influence the interest rates that the Affiliated Banks set.

35.      Defendants fail to fairly disclose the interest rates that the Program offers. Conversely, Defendants never disclose the interest rates that their Deposit Accounts could have earned if their customers' sweep funds had been invested in comparable accounts with non-affiliated banks. This is a material omission of facts that customers would have found important in decided whether to use Defendants as their investment advisor.

36.      The Program Disclosure's statements concerning the "spread" that its Affiliated Banks earn by participating in the Program omits material facts and are misleading because they do not adequately explain the size of the spread or how the

spread impacts the interest rates customers are paid when being automatically enrolled in the Program. Specifically, Defendants fail to disclose that CS&Co uses its discretion to negotiate and enter transactions with the Affiliated Banks regarding the Program pursuant to which CS&Co agrees to artificially low interest rates for its customers' cash in the Program to the benefit of the Affiliated Banks, then declines to charge the Affiliated Banks customary fees for the Program. Through this scheme, CS&Co shifts to the Affiliated Banks large returns on its' customers cash without obtaining customary fees it would normally incur if working with a non-affiliated bank. Thus, CS&Co put the interests of itself and its Affiliated Banks ahead of the interests of its customers, including Plaintiff.

**B. Defendants Know the Program Must Provide a Reasonable Rate of Interest to Retirement Account Investors**

37.     Defendants acknowledge that they have a duty to offer retirement accounts investors a reasonable rate of interest, as evidenced by their own disclosures in some retirement accounts, and legal sources of which they have knowledge.

38.     For example, the Program Disclosures state, "Retirement and other benefit plan accounts will be paid a reasonable rate consistent with applicable legal and regulatory requirements." Thus, Defendants knew or should have known that it was unlawful and a breach of their duties to provide far less than a reasonable rate of interest in the Program for retirement account such as Plaintiff's and all Class

members.

39.     The requirement to pay a reasonable rate of interest derives from the Internal Revenue Code ("IRC"). Section 4975 of the IRC (entitled "Tax on Prohibited Transactions"), applies to IRAs generally, including Plaintiff's IRA. *See* 26 U.S.C. §4975(e)(1)(B) (defining "plan" to include "an individual retirement account described in [IRC] Section 408(a)"). IRC §4975(c)(1)(B) defines as a "prohibited transaction" the "lending of money or other extension of credit between a plan [i.e., an individual IRA] and a disqualified person." A "disqualified person," under Section 4975(e)(2) includes, among others, "a fiduciary" and "a person providing services to the plan." Defendants and the Bank are "disqualified person[s]" under Section 4975(e)(2) and, therefore, the sweep agreement for retirement accounts between Plaintiff and Defendants are "prohibited transaction[s]" under § 4975(c)(1)(B).

40.     IRC §4975(d)(4) provides several "exemptions," or safe harbors, for otherwise "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution." (Emphasis added).

41.     Section 4975 recognizes that related party transactions into which customers are defaulted (such as Defendants' Program) can offer interest rates that may become unfairly lowered due to inherent conflicts of interest.  Accordingly,

conflicted transactions such as affiliated entity cash sweeps are required to pay a reasonable rate of interest. Retirement account customers are particularly vulnerable to receiving inadequate compensation for the use of uninvested cash in their accounts. IRC Section 4975 thus seeks to ensure related party transactions involving retirement accounts are priced at fair market rates.

42.     Regulations promulgated by the Department of the Treasury confirm that the cash swept to the Bank is a "prohibited transaction" but would be permissible (i.e., be within the exemption or safe harbor) if it paid "a reasonable rate of interest." Thus, Treasury regulations state that "Section 4975(d)(4) exempts from the excise taxes imposed by section 4975 investment of all or a part of a plan's assets in deposits bearing a reasonable rate of interest in a bank or similar financial institution…, even though such bank or similar financial institution is a fiduciary or other disqualified person with respect to the plan." 26 C.F.R. §54.4975-6(b)(1).

43.     Treasury regulations also mandate that when a financial institution "invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization "must name" the institution and "must state that [it] … may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)." *Id*. § 54.4975-6(b)(3).

44.     Similarly, ERISA Section 408(b)(1) exempts from prohibition various interested party transactions that "bear a reasonable rate of interest," among other

requirements. *See* 29 U.S.C. §1108(b)(1).

45.     Additionally, FINRA Rule 2122 expressly provides that "[c]harges, if any, for services performed . . . shall be reasonable and not unfairly discriminatory among customers."

46.     Charles Schwab is a member of the American Banker's Association. A March 15, 2017 letter to the Department of Labor from the American Bankers Association, states that with respect to the investment of IRA assets into "one or more bank deposit products, ... banks have routinely relied on the statutory exemption [for prohibited transactions] available for bank deposit product programs under Section 4975(d)(4) of the Code...." In support of this contention, the ABA attached a white paper from Morgan, Lewis & Bockius LLP, which (at 4) specifically notes that a bank may "invest an IRA's assets in its own deposit accounts" "which bear a reasonable interest rate" pursuant to the exemption "found in Section 4975(d)(4) of the Code and Section 408(b)(4) of ERISA." This correspondence constitutes further evidence of Defendants' recognition that their sweep programs constitute conflicted, presumptively prohibited transactions that are only permitted if depositors are receiving a "reasonable" rate of interest.

### C. CS&Co Placed Class Members' Cash in Shockingly Low Interest-Bearing Accounts at Its Affiliated Banks

47.     CS&Co breached its fiduciary and contractual duties by failing to negotiate higher and reasonable interest rates for its customers' uninvested cash in

operating the Program.

48.    As its customers' agent and financial advisor, CS&Co was contractually and legally obligated to act in the best interest of its clients. CS&Co's practice of extracting excessive fees from its customers' cash sweep deposits, through the negotiation of unreasonably low interest rates with Affiliated Banks, was against its customers' interests.

49.    CS&Co did not negotiate higher and reasonable rates of interest for its customers' cash sweep deposits, but instead it worked in consultation with its affiliated bank partners to set artificially and unreasonably low interest rates for deposit accounts in the Program.

50.    Charles Schwab's low interest rates are not reasonable. Section 4975 and ERISA Section 408 place the burden of demonstrating reasonableness on the financial institution. Defendants cannot meet this burden because the interest rates they used in the Program do not meet any definition of a reasonable rate.

51.    Based on its ordinary meaning (using Webster's and Oxford dictionary definitions), "reasonable" is synonymous with "fair." Accordingly, "reasonable" in the valuation context is synonymous with "fair market value" and can be determined using a market approach of comparable instruments. A reasonable rate of interest is the rate that would result in a competitive market under fair market conditions – in other words, an interest rate parties would agree to in an arm's length transaction

where neither party is about exert market power over the other.

52.    Fair market value is defined by the IRS as: "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." 26 C.F.R. § 25.2512-1.

53.    IRS regulations define an "arm's-length interest rate" for purposes of assessing transfer pricing between related entities as

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances. All relevant factors shall be considered, including the principal amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans between unrelated parties. [26 CFR §1.482-2(a)(2)].

54.    Consistent with the plain meaning of reasonableness, which means fair, a reasonable rate pursuant to IRC §4975 (and as acknowledged by Defendants in some of their agreements) is one that considers other market rates for similar products in arm's-length transactions.

55.    For example, the Department of Labor, which maintains enforcement authority with respect to the prohibited transaction rules in the IRC, provided in granting the exemption, a definition of "reasonable rate" that considered a broad range of similar products to bank deposit accounts:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank,

those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (e.g., in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

56.    Three-month treasury bills, an instrument the Department of Labor has advised should be considered in determining a reasonable interest rate, rose in yield from 0.046% as of January 1, 2022 to 5.394% as of January 9, 2024. Nevertheless, Defendants paid interest rates during this period that were a tiny fraction of these rates.

57.    Compared to its competitors, the Program's interest rates are substantially lower than similar sweep products offered by other financial institutions. For example, Vanguard offered interest payments of 4.5% in its Cash Sweep Program; Moo Moo offered 5.1% in its Cash Sweep Program; and Fidelity offered 5%.

58.    Other brokerages that swept cash to unaffiliated banks set rates between brokerages and banks resulting from something that more closely resembles arm's-length negotiations. For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and have consistently paid substantially higher rates of interest than Defendants and other brokerages that sweep cash to affiliated banks.

59.    At year-end 2022, Fidelity paid 2.21% interest on cash balances regardless of tier, and R.W. Baird paid between 1.58% interest (on cash balances up

to $1 million) and 3.08% interest (on cash balances above $5 million). By contrast, Defendants have been paying interest rates as low as 0.01%—virtually nothing.

60.     The federal funds target rate continued to increase in 2023 hitting an effective yield of 5.33% on July 27, 2023. As the federal fund rate increased, so too did Fidelity and R.W. Baird continue to increase the rates they paid on swept cash. Defendants, by contrast, continued to pay close to no interest.

61.     On August 7, 2019, Fidelity issued a press releases announcing that "it has challenged conventional industry practices by automatically directing investors' cash into higher yielding options available for brokerage and retirement accounts as well as providing product choice – all without any minimum requirements." It continued, "Recent customer research shows that many investors don't focus on the rate paid on their cash when they open an account and, too often, they don't take action later. Fidelity has made it easy for customers by automatically giving them the higher yielding option at account opening, while also providing other investment options for those customers who prefer it." And, it noted that Fidelity's approach ""is contrary to typical industry practices of defaulting customers' cash into a low-yielding product – often at an affiliated bank – with no other option in what the industry calls a 'cash sweep.'"

62.     The rates set by Fidelity and R.W. Baird at arm's-length are evidence of the fair market or reasonable rates based on business and economic conditions.

The rates set by Defendants, by default, in self-interested transactions, are not reasonable.

63.     Even when measured against other brokerages who use sweep accounts, Defendants are near the bottom when it comes to interest rates on sweep accounts.

64.     Charles Schwab's interest rates significantly lower than its competitors, but they are also substantially lower than interest rates for money market fund rates. Nevertheless, Defendants automatically place customers into the cash sweep programs it has developed with low yield rates that it negotiated with its Affiliated Banks.

65.     By negotiating significantly lower rates for the cash sweep programs in which it automatically placed Plaintiff and Class members CS&Co did not act in its customers' best interests. Instead, CS&Co put its own interests above theirs, making substantial net income revenue at its customers' expense. In so doing, Defendants breached their fiduciary duties, including their own Code of Conduct.

**E.     Plaintiff's Experience**

66.     Plaintiff has an IRA investment account with CS&Co and has had that account for many years. Plaintiff was enrolled automatically in the Program, and so for years his uninvested cash has been automatically swept into the Affiliated Banks that CS&Co selected in its discretion, at rates as low as 0.20%.

## CLASS ACTION ALLEGATIONS

67.    Plaintiff re-alleges and incorporates by reference the allegations set

forth above.

68.    Plaintiff brings this action individually and as a class action pursuant to

Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf

of the Class consisting of:

> All persons who held cash positions in retirements accounts custodied
> by Defendants and whose cash was subject to Defendants' Bank Sweep
> Program.

69.    This action has been brought and may be maintained as a class action

under Federal Rule of Civil Procedure 23.

### A. Numerosity - Rule 23(a)(1)

70.    Class members are so numerous that their individual joinder is

impracticable. The precise number of Class members and their identities are

unknown to Plaintiff currently. However, Defendants oversee over $9 trillion in

client assets through the work of thousands of financial advisors, and Plaintiff

believes that the members of the proposed Class number in the thousands.

Accordingly, Plaintiff and the Class satisfy the numerosity requirement of Rule

23.

71.    Class members may be notified of the pendency of this action by

mail, published notice, or other appropriate methods.

**B. Existence and Predominance of Common Questions of Law and
Fact – Rule 23(a)(2), 23(b)(3)**

72.     Common questions of law and fact exist as to all members of the Class
and predominate over questions affecting only individual Class members. These
common legal and factual questions, each of which may also be certified under Rule
23(c)(4), include the following, whether:

a.     Defendants owed fiduciary duties to Plaintiff and the putative Class
members in connection with the Bank Sweep Program;

b.     Defendants breached their fiduciary duties to Plaintiff and the putative
Class members in  establishing, maintaining, and/or operating the Bank
Sweep Program;

c.     Defendants' disclosures about the Bank Sweep Program contained
material misrepresentations or omissions;

d.     Defendants breached their contract with Plaintiff and the putative Class
members regarding the Bank Sweep Program, including the implied
covenant of good faith and fair dealing;

e.     Defendants have been unjustly enriched because of the conduct
complained of herein;

f.     Defendants conduct regarding the Bank Sweep Program violates the
UCL;

g.     this case may be maintained as a class action under Fed. R. Civ. P. 23;

h.      to what extent Class members are entitled to damages and other

monetary relief; and

i.      and to what extent Class members are entitled to attorneys' fees and

costs.

### C. Typicality - Rule 23(a)(3)

73.     Plaintiff's claims are typical of the claims of the Class because he was

a customer of Defendants that had his cash balances improperly managed by CS&Co

through its administration of the Bank Sweep Program. Thus, Plaintiff's claims are

typical of the claims of the members of the Class as the claims arise from the same

course of conduct by Defendants, and the relief sought within the Class is common

to the members of each.

### D. Adequacy of Representation - Rule 23(a)(4)

74.     Plaintiff will fairly and adequately protect the interests of Class

members. Plaintiff has retained counsel competent and experienced in complex class

action litigation, and Plaintiff will prosecute this action vigorously. Plaintiff has no

interests adverse or antagonistic to those of the Class.

### E. Superiority - Rule 23(b)(3)

75.     A class action is superior to all other available means for the fair and

efficient adjudication of this controversy. The damages or other financial detriment

suffered by individual Class members are small compared with the burden and

expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for the Class members, on an individual basis, to obtain effective redress for the wrongs done them.

76.     Even if Class members could afford individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

77.     Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

    a. the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

    b. the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not

parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY

(Asserted on behalf of the Plaintiff and the
Class against Defendants)

78.    Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 77, above, as if fully set forth herein.

79.    At all relevant times, Defendants owed fiduciary duties to Plaintiff and the members of the Classes in connection with the Program. Such duties independently arose out of (1) the agency relationship between Defendants, on one hand, and Plaintiff and the members of the Classes on the other hand, as to the Program; (2) Defendants holding and control over beneficial funds that belonged to its customers, related to their cash sweep balances; (3) Defendants' discretion as to the Program and their customers' cash, while acting as their agent; and/or (4) the applicable industry standards, including Reg BI, FINRA standards, and Defendants' Code of Conduct.

80.    As a fiduciary to Plaintiff and the Classes, Defendants owed them the

highest duties of loyalty, candor, due care, and prudence in as to the services they provided to them in connection with establishing, maintaining, and/or operating the Program. Moreover, as a fiduciary, Defendants had a continuing duty to act exclusively for the benefit of Plaintiff and the Classes in connection with establishing, maintaining, and/or operating the Program. Lastly, as a fiduciary, Defendants had a continuing duty to obtain informed consent from Plaintiff and the Classes regarding the Program, and specifically make sufficiently detailed disclosures regarding the Program, their role, the role of various related parties, and any conflicts of interest to obtain such informed consent.

81.     Defendants further owed Plaintiff and the Classes the fiduciary duty to act in good faith in connection with establishing, maintaining, and/or operating the Program.

82.     Defendants further owed Plaintiff and the Classes the duty to charge reasonable fees for their services related to the Bank Deposit Sweep Program.

83.     Plaintiff and the Classes were fully dependent upon Defendants' ability, skill, knowledge, and goodwill with respect to Defendants' Program.

84.     Defendants owed Plaintiff and the Classes similar duties by virtue of their control over Defendants' policies or management regarding Program.

85.     Defendants breached their fiduciary duties by the conduct alleged herein, including by designing, structuring, and/or operating the Program to benefit themselves at the expense of their fiduciary customers, making material

26

misrepresentations and omissions regarding the Program, violating its duty of care, and acting in their own – not their customers' – best interest vis-à-vis the Program.

86.    Defendants violated their duty of loyalty by, among other things, putting their interest above that of their fiduciary customers, failing to provide sufficient information to their fiduciary customers regarding material features of the Program to obtain informed consent from them, and not properly disclosing their own and their affiliates' role in, and conflicts of interest arising out of the Program, as more fully shown above.

87.    As a direct and proximate consequence of Defendants' conduct as alleged herein, Plaintiff and the Classes suffered damages in an amount to be determined at trial and seek disgorgement of any undue and unjust gains of Defendants, as well as all other equitable relief deemed just and proper.

## SECOND CAUSE OF ACTION
### BREACH OF CONTRACT

(Asserted on behalf of the Plaintiff and the
Class against Defendants)

88.    Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 77, above, as if fully set forth herein.

89.    Defendants' relationship with its customers is governed by a written contract, the terms of which are contained in, and incorporated into various standardized documents drafted by Defendants, as outlined above.

90.     Defendants contractually promise that "Retirement and other benefit plan accounts will be paid a reasonable rate consistent with applicable legal and regulatory requirements."

91.     Defendants undertook to act as an agent of the customers regarding all transactions relating to the Program and were thus contractually obligated to obtain for Plaintiff and members of the proposed Classes, through such transactions, rates of return on their cash balances that are reasonable and to otherwise act in their clients' best interests.

92.     As set forth herein, the rates of return paid to customers on their cash balances were not reasonable and Defendants did not act in their clients' best interests. Accordingly, Defendants breached their contracts with Plaintiff and the members of the proposed Class.

93.     Plaintiff and the members of the proposed Class suffered monetary damages because of Defendants' breach of contract.

**THIRD CAUSE OF ACTION**
**BREACH OF THE IMPLIED COVENANT**
**OF GOOD FAITH AND FAIR DEALING**
(Asserted on behalf of the Plaintiff and the Class
Classes against Defendants)

94.     Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 77, above, as if fully set forth herein.

95.     A covenant of good faith and fair dealing is implied into every contract.

96.     Plaintiff and Class members contracted with Defendants to provide them with financial and/or investment services pursuant to the Account Agreement. Under the Account Agreement, Defendants were agents of Plaintiff and Class members and owed them fiduciary duties, including to act in their best interests. Defendants failed to obtain for Plaintiff and Class members higher and reasonable rates of return on their cash balances and instead acted in Defendants' own interests. Moreover, under the Account Agreement, as broker-dealers and pursuant to Reg. BI and 84 Fed. Reg. 134, 17 C.F.R. § 276, Defendants had a duty to act in the best interests of Plaintiff and Class members and not put their interests above Plaintiff and Class members.

97.     These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties (both explicit and implied) and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the covenants that Defendants would act fairly and in good faith in carrying out their contractual obligations to provide Plaintiff and Class member with fair and reasonable rates of return on their cash sweep balances.

98.     Defendants breached these implied covenants of good faith and fair dealing by failing to provide Plaintiff and Class member with fair and reasonable rates of return on their cash sweep balances. Defendants, instead of providing fair

and reasonable rates of return on their clients' cash sweep balances, provided far

below market rates of return that their clients could have otherwise earned on their

cash. Defendants acted dishonestly and failed to exercise and/or abused their

discretion in selecting the banks which would hold Plaintiff and Class members'

cash balances and in failing to negotiate reasonable rates of interest but instead

negotiated higher rates of interest and fees for themselves.

99.     Plaintiff and Class members fulfilled all the terms and obligations of

their contract, including paying for Defendants' services.

100.    Defendants' failure to act in good faith in providing fair and reasonable

rates of return on their customers' cash sweep balances denied Plaintiff and Class

members the full benefit of their bargain. Plaintiff and Class members received a

minimal return on their cash sweep balances that were less than what they could

have otherwise earned and less than their reasonable expectations under their

contract with Defendants.

101.    As a result of Defendants' breach of the implied covenant of good faith

and fair dealing, Plaintiff and Class members sustained damages in an amount to be

determined by this Court, including interest on all liquidated sums.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
(Asserted on behalf of the Plaintiff and
the Class against Defendants)

102.    Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 77, above, as if fully set forth herein.

103.    Because of Defendants' wrongful conduct as alleged herein, Plaintiff and Class members received lower interest payments on their cash sweep balances than they would have in a reasonable and fair market.

104.    Because of Defendants' wrongful conduct as alleged herein, Defendants unjustly received a benefit at the expense of Plaintiff and Class members in the form of increased interest income that belonged to Plaintiff and Class members.

105.    It would be unjust and inequitable to allow Defendants to retain these wrongfully obtained benefits.

106.    Plaintiff and Class members are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest, in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW
(Asserted on behalf of the Plaintiff and
the Class against Defendants)

107.    Plaintiff repeats and incorporates by reference the factual allegations in paragraphs 1 through 77, above, as if fully set forth herein.

108.    The UCL prohibits, and provides civil remedies for, unfair competition. Its purpose is to protect both consumers and competitors by promoting

fair competition in commercial markets for goods and services. In service of that purpose, the Legislature framed the UCL's substantive provisions in broad, sweeping language.

109.    By defining unfair competition to include any "any unlawful, unfair or fraudulent business act or practice," the UCL permits violations of other laws to be treated as unfair competition that is independently actionable, and sweeps within its scope acts and practices not specifically proscribed by any other law.

110.    Defendants' conduct as described herein violates the UCL.

111.    Specifically, Defendants' conduct was not motivated by any business or economic need or rationale. The harm and adverse impact of Defendants' Program was neither outweighed nor justified by any legitimate reasons, justifications, or motives.

112.    The harm to Plaintiff and members of the Class arising from Defendants' unfair practices outweighs the utility, if any, of those practices.

113.    Defendants' conduct was substantially injurious to accountholders in that they have been deprived of fair, market rate interest payments.

114.    As a result of Defendants' violations of the UCL, Plaintiff and members of the Class have paid, and/or will continue to suffer actual damages in the form of lost interest.

115.    Plaintiff alleges that Defendants have, in the course of their business and the course of trade or commerce, undertaken and engaged in unfair business acts

and practices by, among other things, engaging in transactions relating to the Program to generate substantial revenue for themselves with their customers' cash and beneficial returns on such cash, while paying their customers only a small fraction of those returns and concealing from such customers the portions of those customers' returns that they directed to and conferred upon their affiliates and the fact that those portions represented the vast majority of such interest. Defendants have further engaged in material misrepresentations and omissions regarding key features of the Program.

116.    The deceptive business acts or practices described herein presented a threat and likelihood of harm and deception to Plaintiff and the Class in that Defendants has systematically perpetrated the unfair conduct upon members of the public by engaging in the conduct described herein.

117.    As a result of Defendants' misrepresentations and omissions of material facts concerning the Program, Plaintiff and the Class have suffered an ascertainable loss of money, property, and/or value and were harmed and suffered actual damages.

118.    Had Plaintiff and the Class been aware of the Defendants conduct with respect to the transactions relating to the Program, which greatly favored Defendants and their affiliates at their fiduciary customers' expense, Plaintiff and the Class would not have participated in those investment products or would have done so on different terms.

## PRAYER FOR RELIEF

Plaintiff requests relief as follows:

1.    Actual damages

2.    Punitive damages

3.    Injunctive relief prohibiting Defendants from continuing to engage

in the conduct alleged herein

4.    Attorneys' fees and costs of suit;

5.    Prejudgment interest; and

6.    Such other relief as the Court deems just and proper

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated:        October 24, 2024        Respectfully submitted,

**EDELSBERG LAW, P.A.**

*/s/ Adam A. Schwartzbaum, Esq.*
Scott A. Edelsberg, Esq.
Florida Bar No. 100537
scott@edelsberglaw.com
Adam A. Schwartzbaum, Esq.
Florida Bar No. 93014
adam@edelsberglaw.com
20900 NE 30th Ave Suit 417
Aventura, FL 33180

Tel: 305-975-3320

**SHAMIS & GENTILE, P.A.**
Andrew J. Shamis, Esq.
Florida Bar No. 101754
ashamis@shamisgentile.com
14 NE 1st Avenue, Suite 1205
Miami, Florida 33132
Telephone: 305-479-2299

*Counsel for Plaintiff and the Proposed Class*